**Ahmed KAMARA, Petitioner,**

v.

**Steven J. FARQUHARSON District Director of The United States Immigration & Naturalization Service, Respondent.**

**Civ. A. No. CA–97–12026–PBS.**

United States District Court,
D. Massachusetts.

March 23, 1998.

82

Stephen A. Lagana, Lagana & Associated, Boston, MA, for Ahmed Kamara.

Frank Crowley, Immigration & Naturalization, Special Asst. U.S. Atty., Boston, MA, for Steve Farquharson.

Carolyn M. Kirby, Hillsborough County Attorney's Office, Manchester, NH, for James Howell, Michael Mathon.

## MEMORANDUM AND ORDER

SARIS, District Judge.

Petitioner Ahmed Kamara has filed a petition for writ of habeas corpus claiming that his continued detention by the Attorney General constitutes an abuse of discretion because he suffers from a serious medical condition, hepatitis. Kamara, who is now subject to a final order of deportation, is effectively challenging the decision by an immigration judge ("IJ") of the United States Immigration & Naturalization Service ("INS") who denied his request for bond.

Respondent moves to dismiss this action for the Court's lack of subject-matter jurisdiction over detention decisions pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), 8 U.S.C. § 1252(g), and in the alternative, for Kamara's failure to exhaust administrative remedies by not appealing the decision of the IJ to the Board of Immigration Appeal ("BIA").

After hearing, the motion to dismiss is **ALLOWED** on the ground that Kamara, against whom four temporary restraining orders by four different women have been issued, has not demonstrated that the IJ abused her decision in denying his release on bond.

### Factual Background

Ahmed Kamara is a native and citizen of Mauritania who entered the United States on July 11, 1994 as a nonimmigrant visitor, and remained here beyond the expiration of his visitor's visa. On January 30, 1996, deportation proceedings were commenced against Kamara based upon an order to show cause charging him with remaining in the United States for a period longer than permitted in violation of section 241(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1251(a)(1)(B) (1996).[1] At hearing before an IJ on November 11, 1996, deportability was established and Kamara applied for voluntary departure, pursuant to section 244(e) of the INA, 8 U.S.C. § 1254(e)(1) (1996).[2] Kamara was taken into INS custody

1. This provision, originally enacted as section 241 of the INA June 27, 1952, ch. 477, was redesignated § 237 of such Act by the Illegal Immigration Reform And Immigrant Responsibility Act of Sept. 30, 1996, P.L. 104–208, Div C, Title III, Subtitle A, § 305(a)(2), 110 Stat. 3009–598, and has since been transferred by the compilers of the United States Code to 8 U.S.C. § 1227. See 8 U.S.C.S. §§ 1251, 1227 (Law.Coop.1997).

2. This section provides that in the discretion of the Attorney General, any alien under deportation proceedings (other than certain aliens who

on December 5, 1996 on a $150,000 bond condition. Evidentiary hearings were held on December 4 and 18, 1996, at the close of which the IJ denied Kamara's application for voluntary departure and ordered him deported to Mauritania. She based this decision upon a finding that Kamara lacked the good moral character to be granted such relief, in light of evidence that four restraining orders concerning four different women had been issued against him, as well as evidence of Kamara's involvement in various fraudulent and injurious financial schemes.[3] Having heard from Kamara and a host of victim witnesses for the government, the IJ concluded that Kamara "is a dangerous man"—in her opinion, "a sociopath"—who "has used his intelligence to live at the expense of others" and whose "credibility is hopelessly impaired." Accordingly, she ordered that Kamara continue to be held without bond pending appeal to the BIA.

Kamara's request for a bond redetermination had already been denied by the IJ. Rather than reduce the $150,000 bond condition set when Kamara was first taken into custody, she instead ordered that Kamara be held without bond. This order, dated December 11, 1996, informed Kamara that he had reserved the right to appeal the no-bond determination to the BIA until January 10, 1997. *See* 8 C.F.R. § 242.2(d). Kamara did not exercise this right.

On January 21, 1997, Kamara filed a late appeal from the December 18, 1996 order denying his application for voluntary departure. Because the filing of a Notice of Appeal is required within 30 calendar days of the IJ's oral decision, *see* 8 C.F.R. § 3.38(b), that appeal was due on or before January 17, 1997.

In April of 1997, Kamara was diagnosed with chronic hepatitis by INS medical doctors. Since that time, he has made numerous requests to be transferred from the Hillsborough County House of Corrections, Manchester, NH ("Hillsborough"), a high-end security correctional facility, to Service Processing Center, Boston, MA ("SPC Boston"), in order to receive better medical treatment for his condition and because he fears for his safety at Hillsborough. In his most recent pro se court submission of February 17, 1998, Kamara states that his complaints of oral bleeding and other symptoms of his illness have been met with threats by the "security department" and inaction by the "medical department" at Hillsborough.

In April and October of 1997, Kamara was seen by Dr. Mark J. Silversmith of the Center for Gastrointestinal Medicine, Inc. In a letter dated April 10, 1997, Dr. Silversmith stated his opinion that Kamara was likely suffering from chronic hepatitis but recommended that "before even contemplating Interferon therapy, with its attendant side effects ... it would be wise to try and document six months of surface antigen positive blood." The letter documents that Kamara wanted the treatment to begin immediately and that he refused treatments recommended by Dr. Silversmith to relieve some of his abdominal discomfort in the short-run. In a second letter dated October 9, 1997, Dr. Silversmith stated that lab work confirmed Kamara's status as a chronic carrier of hepatitis C. He recommended that a 16 week-long course of interferon Intron–A therapy be initiated pending the results of some further lab work, and that "[i]f [Kamara] will get better and appropri-

---

would be excluded from this relief) may be allowed to leave voluntarily at his own expense in lieu of deportation if the Attorney General is satisfied that the alien is and has been a person of "good moral character" for at least five years immediately preceding his application for voluntary departure. *See* 8 U.S.C. § 1254(e)(1) (1996). Provisions governing voluntary departure are now codified at 8 U.S.C. § 1229c. *See* 8 U.S.C.S. § 1229c(b)(1)(B) (Law.Co-op.1997) (expressly delegating Immigration Judges the authority to enter an order granting voluntary departure at the conclusion of removal proceedings in lieu of an order of removal based on, inter alia, a "good moral character" finding, subject to the discretion of the Attorney General).

**3.** *See* 8 U.S.C. § 1101(f) (1996) (providing non-exhaustive list of specific classes of individuals who shall not be regarded as persons of "good moral character" though "[t]he fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character").

ate therapy in Boston, then he should be transferred there."

On July 1, 1997, District Director Farquharson received a transmittal from the Mauritanian Embassy, dated April 29, 1997, requesting Kamara's release from custody on the basis that "Mr. Kamara is very sick and needs to be out for medical reasons." Farquharson denied the request in a written decision dated July 7, 1997, stating that "[d]ue to doctor, client confidentiality, this Service has no way of verifying any sickness claim without the consent of Mr. Kamara. . . . Therefore, any sickness claimed by Mr. Kamara is currently considered unfounded." Farquharson further justified Kamara's continued detention, stating that "Mr. Kamara has been charged with serious crimes against people, for which he presently has a restraining order issued against him . . . . [which] clearly demonstrate[s] that he is a threat to the community." Finally, he noted that "Mr. Kamara has the choice at any time of maintaining this appeal or withdrawing it and being immediately removed to his native homeland."

On October 27, 1997 the BIA denied Kamara's appeal of the December 18, 1996 order as untimely, thereby subjecting him to a final order of deportation. *See* 8 C.F.R. § 243.1. On November 25, 1997, Kamara filed a motion to reopen alleging ineffective assistance of counsel, which he claims resulted in the untimely filing. On November 26, 1997, Kamara filed a petition for review with the First Circuit Court of Appeals, at which time the First Circuit ordered the previous order of deportation stayed pending adjudication of the motion to reopen.

At hearing before this Court on January 14, 1998, the government acknowledged that Kamara's interferon treatment did not get underway until November of 1997. The government also represented to the Court, however, that Kamara's treatment has been ongoing since that time, and that he is currently receiving adequate medical treatment

for his condition. Because the record contained no account, apart from the two Silversmith letters, of Kamara's treatment at Hillsborough, the Court requested that the government produce documentation in support of its position. On January 20, 1998, a bare-bones affidavit of Alan M. Stein, the Medical Director at Hillsborough, was faxed to the Court. In it Stein concludes, having "familiarized [himself] with the medical particulars of the case," that Kamara's medical needs are being met at Hillsborough and that relocation to Boston is unnecessary; he provides no detail whatsoever as to the basis for his medical opinion.

## DISCUSSION

Kamara asks the Court to find that the decision to deny him bond and to continue his detention despite his medical condition constitutes an abuse of discretion, and to vacate the decision and order his release on bond. *See* Pet. ¶ 15. In the alternative, as was made clear in the January 14, 1998 hearing, Kamara seeks a transfer from Hillsborough to SPC Boston. Both requests for relief are grounded primarily in Kamara's claims that he has not received adequate medical care from the time he was diagnosed with chronic hepatitis in April of 1997. Kamara has also filed a motion for reconsideration of respondent's motion to quash subpoenas, likewise grounded in his claim of poor medical treatment; he seeks to depose correctional officers he believes would attest to his experiences at Hillsborough. Kamara does not seek review from this Court of his final order of deportation or otherwise challenge that he was lawfully taken into INS custody in December of 1996.

### A. Jurisdiction

■ Kamara asserts several bases of this Court's jurisdiction to review the no-bond decision, namely 28 U.S.C. § 1361, 5 U.S.C. §§ 701 et seq., and 28 U.S.C. § 2241.[4] The

---

4. Although he styles his action a petition for habeas corpus, Kamara's theories of jurisdiction actually hinge on the mandamus statute, 28 U.S.C. § 1361 and the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq., for failure of the INS to perform a duty of care owed him. It is

well-established that these statutory provisions do not provide independent jurisdictional bases for review of discretionary decisions. *See Starbuck v. City and County of San Francisco*, 556 F.2d 450, 459 n. 18 (9th Cir.1977) (construing 28 U.S.C. § 1361); *Califano v. Sanders*, 430 U.S. 99,

## 85

government argues that the Court lacks subject-matter jurisdiction over review of such discretionary decisions pursuant to the Illegal Immigration Reform And Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009, 1277.

Section 306(a) of IIRIRA amends section 242(g) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(g), to provide:

EXCLUSIVE JURISDICTION.—Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

8 U.S.C.S. § 1252(g) (Law.Co-op.1997). Section 306(c)(1) further provides that "subsection (g) [Exclusive Jurisdiction] ... shall apply without limitation to claims arising from all past, pending or future exclusion, deportation, or removal proceedings under such Act," except in the context of a petition for direct review of a final deportation order to a United States Court of Appeals, and "notwithstanding any other provision of law." IIRIRA § 306(c)(1), as amended by technical corrections on October 11, 1996, Pub.L. 104–302, 110 Stat. 3656; *see American–Arab Anti–Discrimination Comm. v. Reno*, 119 F.3d 1367, 1371, n. 2 (9th Cir.1997) ("As IIRIRA expressly addresses the retroactivity of the relevant jurisdictional provision, we need not apply the default rules (regarding retroactivity) elaborated in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280–81, 114 S.Ct. 1483, 128 L.Ed.2d 229 ... (1994)."), *petition for cert. filed*, 66 U.S.L.W. 3525 (U.S. Jan. 30, 1998) (No. 97–1252); *Safarian v. Reno*, 968 F.Supp. 1101, 1105 (E.D.La.1997) ("There is debate as to whether the section § 1252(g) became effective upon enactment of the IIRIRA, or on the April 1, 1997 effective date, but since both have passed, the amendment, with its retroactive provisions must be applied to the case at hand.").

Most courts construing IIRIRA have held that § 1252(g) completely divests a district court of statutory jurisdiction to review decisions by the Attorney General arising out of deportation proceedings. *See, e.g., Ramallo v. Reno*, 114 F.3d 1210, 1214 (D.C.Cir.1997), ("IIRIRA now undisputably deprives both district courts and courts of appeals of jurisdiction to decide the instant action [arising from the 'decision or action' of the Attorney General to execute a removal order]."), *petition for cert. filed*, 66 U.S.L.W. 3264 (1997) (No. 97–52); *Safarian v. Reno*, 968 F.Supp. at 1105 ("Generally, § 1252 has been held to divest the district court completely of all jurisdiction to review alien's claims.") (citing cases); *Yang v. INS*, 109 F.3d 1185, 1195 (7th Cir.1997) ("IIR[IR]A abolishes even review under § 2241, leaving only the constitutional writ, unaided by statute."), *cert. denied sub nom. Katsoulis v. INS*, —— U.S. ——, 118 S.Ct. 624, 139 L.Ed.2d 605 (1997). *But see Mojica v. Reno*, 970 F.Supp. 130, 157 (E.D.N.Y.1997) (holding that IIRIRA does not remove statutory habeas jurisdiction because it does not contain express language repealing § 2241 and because to do so would violate the separation of powers doctrine); *Ozoanya v. Reno*, 968 F.Supp. 1, 6–7 (D.D.C. 1997) ("[T]he vague and uncertain language of Section 306(a)(2) of the IIRIRA ("except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear ...") does not eliminate the recognized jurisdiction of the district courts under 28 U.S.C. § 2241 to hear habeas corpus claims of any person in custody, including deportable aliens.").

This Court agrees that the language of IIRIRA § 1252(g) issues a "firm command" to district courts that statutory jurisdiction no longer exists to entertain any claims for relief which arise from any past "decision or action" of the Attorney General to "commence proceedings," "adjudicate cases" or "execute removal orders." *See Ramallo*, 114 F.3d at 1213. The tougher question is whether this Court has jurisdiction over Kamara's request for the Court to vacate a no-bond decision. The government asserts that such a request falls within section 1252(g)'s exclusive jurisdiction provisions on the theory that it arises from the decision

105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (construing the Administrative Procedure Act).

of the Attorney General to adjudicate cases and/or to execute orders of removal. The cases cited by the government in support of that theory, however, are inapposite, as they concern IIRIRA's effect on judicial review of either stays of deportation or final orders of deportation—not of bond decisions taken prior to a final order of deportation. *See, e.g., Benziane v. U.S.,* 960 F.Supp. 238, 242 (D.Colo.1997) ("The relief [petitioner] seeks ... a stay of deportation so that he may pursue what he claims are newly available administrative remedies ... [is the type of request for which] habeas review is unavailable.").

Under pre-IIRIRA decisions, bond hearings for those aliens who have not been subject to a final order of deportation were treated as "separate and apart from deportation hearings." *Gornicka v. INS,* 681 F.2d 501, 505 (7th Cir.1982) ("Whether or not bond is required has no bearing on whether a final order of deportation will be entered. A bond determination is not final order of deportation, is not made during an administrative proceeding under section 1252(b) and does not effect [sic] the deportation proceeding."); *Montero v. Cobb,* 937 F.Supp. 88, 91–92 (D.Mass.1996) (distinguishing final orders of deportation, which require exhaustion of administrative remedies for review by courts of appeals, from pre-deportation orders such as bond determinations, which do not require exhaustion of administrative remedies for review by district courts); *Moskalev v. District Director, INS,* Civ. A. No. 95–11218–RGS, slip op. at 6, 1996 WL 622475, at *3 (D.Mass. January 24, 1996) (Alexander, Ch. M.J.) ("[B]ond determinations are reviewable as separate and distinct from deportation hearings and have been held to be subject to review by a district court.") (quotations and citations omitted); *Motta v. District Director, INS,* 869 F.Supp. 80, 84 (D.Mass. 1994) ("The district courts continue to have jurisdiction over orders denying ancillary relief, which are not entered in the course of the deportation hearing or the denial of a motion to reopen.") (citing cases), *judgment vacated on other grounds,* 61 F.3d 117 (1st Cir.1995). *See generally* 8 C.F.R. 3.19(d).

Based on the precedent distinguishing between detention and deportation proceedings, I conclude that Kamara's request for judicial review of a no-bond decision taken prior to the issuance of a final deportation order is not precluded by § 1252(g). The jurisdictional thicket becomes even denser, however, because the procedural focus has changed since the time Kamara filed this action in August 1997, in light of the BIA's final order of deportation issued on October 27, 1997.

Prior to the passage of IIRIRA, this Court had jurisdiction to review any determination of the Attorney General concerning detention both prior and subsequent to a final order of deportation, upon a conclusive showing in a habeas corpus proceeding that the Attorney General was not proceeding with "reasonable dispatch." 8 U.S.C. §§ 1252(a), 1252(c). Here, Kamara has made no such claim. Moreover, as the INS points out, Kamara has at no time exercised his right to present his changed medical condition as a basis for a custody redetermination. *See* 8 C.F.R. § 3.19(e); *see also In the Matter of Ghalamsiah,* 806 F.2d 68, 73 (3d Cir.1986) (holding that pursuant to 8 U.S.C. § 1252(c) the Attorney General "has the exclusive discretionary authority to release on bail an alien, not illegally detained, pending a motion to reopen the deportation proceedings, subject to review by a district court").

For aliens in deportation proceedings after April 1, 1997, IIRIRA strips all courts of jurisdiction to review any decision by the Attorney General regarding the detention of any alien under any circumstances. *See* 8 U.S.C.S. §§ 1226(e), 1252(a)(2)(B) (Law.Co-op.1997).[5] Pursuant to the IIRIRA's "transi-

---

5. Provisions governing the "apprehension and detention of aliens" for whom proceedings have commenced subsequent to April 1, 1997 are now codified in § 1226, amending section 236 of the INA. *See* 8 U.S.C.S. § 1226 (Law.Co-op.1997). Unlike the former § 1252 (1996), the newly codified § 1226 prohibits judicial review of bond-related decisions altogether: "The Attorney Gen-

eral's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C.S. § 1226(e) (Law.Co-op.1997). The newly amended section 242(g) of

tion" rules, these new provisions appear not to apply to the detention decision here because Kamara was in deportation proceedings before April 1, 1997. *See* IIRIRA §§ 309(a), 309(c)(1).

Pressed with the need to navigate circumspectly between this Scylla and Charybdis of pre- and post-IIRIRA jurisdiction, I have grave concerns about my jurisdiction to review an alien's continued detention after a final order of deportation has issued by the BIA denying a request for voluntary departure, subject only to a motion to reopen.[6] For purposes of this motion, I assume I have jurisdiction.

"It is a familiar tenet that when [a claim] presents a jurisdictional quandary, yet the merits of the underlying issue, if reached, will in any event be resolved in favor of the party challenging the court's jurisdiction, then the court may forsake the jurisdictional riddle and simply dispose of the [action] on the merits." *United States v. Stoller*, 78 F.3d 710, 715 (1st Cir.1996), *cert. dismissed*, —— U.S. ——, 117 S.Ct. 378, 136 L.Ed.2d 297, 65 U.S.L.W. 3342 (U.S. Oct. 30, 1996) (No. 95–1936); *see also Berner v. Dela-*

*hanty*, 129 F.3d 20, 23 (1st Cir.1997) (cautioning that "the general rule is that a courts should first confirm the existence of rudiments such as jurisdiction" and that "[t]he exception discussed in *Stoller* is exactly that—an exception which, in light of the danger that an ensuing decision on the merits might be rendered sterile by the tribunal's lack of authority to resolve the case, should be used sparingly"), *petition for cert. filed*, —— U.S.L.W. —— (U.S. Jan. 26, 1998) (No. 97–1240).

■ Proceeding to the merits, both the District Director's initial determination to detain Kamara and the IJ's subsequent denial of bond in December 1996 are decisions committed by statute to the Attorney General's discretion.[7] *See* § 1252(a)(1) (1996). *See generally United States ex rel. Barbour v. District Director of INS*, 491 F.2d 573, 577–78 (5th Cir.1974) (discussing broad discretion vested in Attorney General and his delegates to make bond determinations). District court review of such discretionary decisions through habeas corpus prior to IIRIRA's effective date is confined to whether such decision constituted an abuse of discretion,

IIRIRA, codified in 8 U.S.C.S. § 1252(a)(2)(B)(ii) (Law.Co-op.1997), provides for the broad elimination of judicial review of any "decision or action of the Attorney General the authority for which is specified under this title [8 USCS §§ 1151 et seq.] to be in the discretion of the Attorney General," other than with regard to certain asylum relief.

6. Indeed, pursuant to the "transitional" rules set forth in IIRIRA section 309(c)(4)(E), for cases in which a final order of deportation has been issued after October 30, 1996, it is unlikely that any court has jurisdiction to review an IJ's decision to deny an alien's application for voluntary departure. *See* IIRIRA § 309(c)(4)(E) (providing that for those cases in which a final order of deportation has entered more than 30 days from the date of IIRIRA'S enactment (i.e. after October 30, 1996), notwithstanding other provisions of the INA in effect as of the date of enactment of IIRIRA to the contrary, "there shall be no appeal of any discretionary decision under section ... 244....."). Because a final order of deportation, subject to Kamara's motion to reopen, was entered on October 27, 1997—well after the October 30, 1996 triggering date imposed by the transitional rules—Kamara's case is covered by section 309(c)(4)(E). *Compare Skutnik v. INS*, 128 F.3d 512, 513–14 (7th Cir.1997) (holding that under section 309(c)(4)(E), the Court lacked

jurisdiction to review denial of suspension of deportation under section 244 of the INA, 8 U.S.C. § 1254 (1996), where final order of deportation was issued on February 27, 1997); *and Meguenine v. INS*, 139 F.3d 25, 26 (1st Cir.1998) (exercising jurisdiction to review BIA denial of application for asylum and withholding of deportation because while alien was subject to "transitional" rules governing review of BIA decisions issued after October 31, 1996, petitioner was in proceedings prior to April 1, 1997, and "aliens under the 'transition rules' [of section 309] continue to be governed by former INA § 106, subject to certain exceptions which do not apply here").

7. Kamara wrongly relies on section 212(d)(5), 8 U.S.C. § 1182(d)(5)(A) (1996), as the provision which governs the Attorney General's parole powers with regard to his claim; that section concerns requests for parole by excludable not removable aliens, i.e. requests pending a decision on an alien's admission, not his deportation. Pursuant to IIRIRA's effective dates and transition rules, judicial review of bond decisions under § 1252 (1996) govern in this action. *See* IIRIRA §§ 303(a), 303(b)(1), 309(a) & 309(c)(1) (combining to provide for general rule that new amendments do not apply to those aliens, like Kamara, who were in proceedings before IIRIRA's April 1, 1997 effective date).

and it is the alien who bears the "heavy burden" of proving such abuse. *See id.* In applying this deferential standard of review, a court must only determine "whether the agency's decision is supported by, or has reasonable foundation in, the record." *O'Rourke v. Warden, Metropolitan Correction Center,* 539 F.Supp. 1131, 1135 (S.D.N.Y.1982); *see also Motta,* 869 F.Supp. at 87 ("Respondent's decision may be overridden only if was 'without reasonable foundation' in fact.") (quoting *Barbour* ).

In the instant case, Kamara has made no showing of an abuse of discretion by the Attorney General, through any of her delegates, in denying him release on bond. The IJ based her no-bond decision on her conclusions regarding Kamara's dangerousness, as articulated in her December 18, 1996 decision. *See Matter of Ellis,* 20 I. & N. Dec. 641, 642 (BIA 1993) ("[A]n alien, whom the Service in its discretion has arrested and taken into custody, generally should not be detained or required to post bond pending a determination of deportability except on a finding that he is a threat to [the community] or is a poor bail risk.") (citing *Matter of Patel,* 15 I. & N. Dec. 666 (BIA 1976)). Citing the IJ's opinion, District Director Farquharson responded by letter to the Mauritanian Embassy's transmittal seeking Kamara's release, stating that Kamara "is a threat to the community and his continued detention [is] justified." *See Caporali v. Whelan,* 582 F.Supp. 217, 219 (D.Mass., 1984) ("[T]he Attorney General must make a reasoned determination, disclosing the facts on which this determination was based and the source of these facts.").

Kamara asserts that the "existence of restraining orders, standing alone, is not sufficient evidence of threats to the community" and that due to his medical condition, he would not pose a significant flight risk or danger to anyone. *See* Pet. ¶¶ 12, 13. To my knowledge, however, Kamara never presented any evidence of a change in circumstances based on his medical condition to the IJ, the District Director or the BIA. *See* 8 C.F.R. § 3.19(e). An undocumented letter by an ambassador to the District Director does not suffice as a request to modify bond conditions. *Id.* ("After an initial bond redetermination, a request for a subsequent bond redetermination shall be made in writing and shall be considered only upon a showing that the alien's circumstances have changed materially since the prior bond redetermination."). Because Kamara never sought release on the basis of a medical condition that was first discovered and diagnosed *after* the no-bond decision was taken, and in light of the IJ's documented finding of dangerousness, I am hard-pressed to find any abuse of discretion.[8]

### B. *Claims Regarding Conditions of Confinement*

■ Kamara's writ of habeas corpus seeks relief for alleged violations of his constitutional rights to receive better medical treatment than he alleges he has received at Hillsborough. The gravamen of Kamara's complaint at oral argument was that he has received inadequate medical treatment for his hepatitis and oral bleeding due to a "plan of delay" orchestrated by Hillsborough employees and INS officials in administering his interferon treatment, and that he continues

---

**8.** As Kamara's claim fails under the pre-IIRIRA abuse of discretion standard, the Court need not reach the government's alternative exhaustion argument for Kamara's failure to appeal his bond determination to the BIA. Several courts, including two in this district, have rejected similar arguments. *See Montero v. Cobb,* 937 F.Supp. 88, 91–92 (D.Mass.1996) (holding exhaustion of administrative remedies requirement inapplicable to pre-deportation order bond determinations and that federal court thus retained jurisdiction for review of bond decision despite petitioner's failure to appeal the decision to the BIA); *Moskalev v. District Director, Immigration and Naturalization Serv.,* Civ.A. No. 95–11218–RGS, slip op. at 6, 1996 WL 622475, at *3

(D.Mass. January 24, 1996) ("[T]he statutory scheme of the immigration act does not require exhaustion for suits challenging pre-deportation detention.") (citations omitted); *cf. National Ctr. for Immigrants' Rights, Inc. v. Immigration and Naturalization Serv.,* 791 F.2d 1351, 1354 (9th Cir.1986), *rev'd on other grounds,* 481 U.S. 1009, 107 S.Ct. 1881, 95 L.Ed.2d 489 (1987) ("The only exhaustion requirement of the [INA] applies to 'orders of deportation or of exclusion' and not to conditions imposed on bonds prior to such order."). Respondent has cited no cases to support an exhaustion requirement with respect to bond determinations made prior to a final order of deportation.

to be denied constitutionally mandated adequate medical care to date. Kamara does not challenge that he was lawfully placed in INS custody for having overstayed his visa, but rather seeks to be released or transferred on the basis of his medical status.

It is a well-settled general principle that a habeas petition is the appropriate means to challenge the "actual fact or duration" of one's confinement, *see Heck v. Humphrey*, 512 U.S. 477, 481, 114 S.Ct. 2364, 2369, 129 L.Ed.2d 383 (1994), whereas a civil rights claim is the proper means to challenge the "conditions" of one's confinement. *See Viens v. Daniels*, 871 F.2d 1328, 1333 (7th Cir. 1989); *see also White v. Gittens*, 121 F.3d 803, 807, n. 3 (1st Cir.1997) (noting applicability of general rule to § 1983 actions for both declaratory relief and damages). Consistent with this general rule, a claim of inadequate medical treatment while in legal custody is ordinarily brought as a civil rights suit for damages or injunctive relief pursuant to 42 U.S.C. § 1983, where the defendants are state actors, or on a *Bivens* theory, *see Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971, where the defendants are federal actors). It follows that "if [the petitioner] is seeking a different program or location or environment, then he is challenging the conditions rather than the fact of his confinement and his remedy is under civil rights law...." *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir.1991).

Even though nothing in IIRIRA precludes jurisdiction in this Court over claims challenging the conditions of confinement, Kamara's challenges to the adequacy of his medical treatment do not concern the fact, duration or degree of his confinement, but rather the conditions of his confinement. His claims of inadequate medical treatment, "substantial" though they may be, thus do not form the basis of a habeas corpus action. *See Ramallo v. Reno*, 114 F.3d 1210, 1214 (D.C.Cir.1997) (recognizing that after IIRIRA, "habeas review remains available ... to raise substantial constitutional questions"). That Kamara's petition seeks the relief of a transfer to another facility does not transform what is at heart a conditions-of-confine-

ment basis for his constitutional challenge. Accordingly, this Court must dismiss Kamara's habeas corpus petition seeking release, though without prejudice to any due process or Eighth Amendment claims of deliberate indifference to his medical needs.

### *ORDER*

Respondent's motion to dismiss (Docket No. 3) is **ALLOWED** and Petitioner's motion for reconsideration and the allowance of the motion to quash subpoena (Docket No. 14) and petition for habeas corpus (Docket No. 1) are **DENIED** without prejudice to any civil rights claims.